IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| Plaintiff, | ) ) Civil Action No. |
| v. | ) ) **COMPLAINT** ) **AND JURY TRIAL DEMAND** |
| EUREKA STONE QUARRY, INC. and JAMES D. MORRISSEY INC., | ) ) ) |
| Defendants. | ) ) ) |

NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and Title I of the Civil Rights Act of 1991, to correct unlawful employment practices because of race and retaliation and to provide appropriate relief to Charging Party Harold Powell. As alleged with greater particularity in Paragraphs 15 through 53 below, Defendants Eureka Stone Quarry, Inc. and James D. Morrissey, Inc. ("Defendants") subjected Mr. Powell to unlawful harassment and constructive discharge because of his race (Black) and in retaliation for his opposition to unlawful employment practices in violation of Title VII.

JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.§ 2000e-5(f)(1) and (3), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were committed within the

jurisdiction of the United States District Court for the Eastern District of Pennsylvania.

## PARTIES

3. Plaintiff, the U.S. Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

4. At all relevant times, Defendants, which are Pennsylvania corporations, have continuously been doing business in the State of Pennsylvania, the City of Philadelphia and Borough of Chalfont and have continuously had at least 15 employees.

5. Defendant Eureka Stone Quarry, Inc. employed more than 100 employees for at least 20 calendar weeks during each of the following calendar years: 2016, 2017, 2018, 2019 and 2020.

6. Defendant James D. Morrissey Inc. employed more than 400 employees for at least 20 calendar weeks during each of the following calendar years: 2016, 2017, 2018, 2019 and 2020,

7. At all relevant times, Defendants have continuously been employers engaged in an industry affecting commerce within the meaning of Section 701(b), (g) and (h) of Title VII, 42 U.S.C. § 2000e(b), (g) & (h).

8. Defendant Eureka Stone Quarry, Inc. and Defendant James D. Morrissey, Inc. constitute a single "employer" within the meaning of Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h):

    a.    Defendants share common ownership.

    b.    Defendants share common officers.

c. Certain managers, including but not limited to Safety Director James Furey, are considered by Defendants to be, and are, employees of both Defendants.

d. Defendants share a single website attributed to James D. Morrissey, Inc. On the website they hold themselves out to third-parties as a single enterprise, including listing all Eureka Stone Quarry, Inc. facilities as James D. Morrissey Inc. facilities.

e. Defendant James D. Morrissey, Inc. holds itself out to third-parties as "vertically integrated" with Defendant Eureka Stone Quarry, Inc. Upon information and belief, Defendant Eureka Stone Quarry, Inc. supplies James D. Morrissey, Inc. with materials for the latter's construction operations, either directly or through another integrated entity.

f. Defendants share employee recruitment and hiring functions, with the James D. Morrissey, Inc. website used to advertise and solicit applications for positions at both Eureka Stone Quarry, Inc. and James D. Morrissey, Inc.

g. Defendants share financial functions, with the James D. Morrissey, Inc. website used to receive payment from customers on invoices from both Eureka Stone Quarry, Inc. and James D. Morrissey, Inc.; to solicit and receive customer applications for credit from both Eureka Stone Quarry, Inc. and James D. Morrissey, Inc.; and to solicit and receive customer requests for quotes from both Eureka Stone Quarry, Inc. and James D. Morrissey, Inc.

h. Defendant Eureka Stone Quarry, Inc.'s managers, including but not limited to Safety Director James Furey, who performs human resources functions for Eureka Stone Quarry, Inc., hold themselves out to employees and third-parties as employees and

3

management officials of both Eureka Stone Quarry, Inc. and Defendant James D. Morrissey Inc.

      i.      Defendant Eureka Stone Quarry, Inc.'s managers, including but not limited to Safety Director James Furey, are paid wages from accounts held by Defendant James D. Morrissey Inc.

      j.      Defendant Eureka Stone Quarry, Inc.'s managers, including but not limited to Safety Director James Furey, are provided important employment benefits, including but not limited to health and 401K benefits, by Defendant James D. Morrissey Inc.

      k.      The Vice President and General Counsel of Defendant James D. Morrissey Inc. represented Defendant Eureka Stone Quarry, Inc. during the EEOC administrative investigation of this matter.

## ADMINISTRATIVE PROCEDURES

9. More than thirty days prior to the institution of this lawsuit, Harold Powell filed a charge with the Commission alleging violations of Title VII by Defendant Eureka Stone Quarry, Inc.

10. On February 9, 2021, the Commission issued to Defendants an administrative Determination finding reasonable cause to believe that Defendants violated Title VII and inviting Defendants to join with the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

11. The Commission engaged in communications with Defendants to provide Defendants the opportunity to remedy the discriminatory practices described in the administrative Determination.

12. The Commission was unable to secure from Defendants a conciliation agreement

acceptable to the Commission.

      13.      On March 18, 2021, the Commission issued to Defendants a Notice of Failure of Conciliation.

      14.      All conditions precedent to the initiation of this lawsuit have been fulfilled.

STATEMENT OF CLAIMS

*Count I: Hostile Work Environment Because of Race (Black) and Retaliation (Opposition)*

      15.      On or about June 2016 and continuing until on or about July 29, 2020, Defendants and their employees subjected Harold Powell to a hostile work environment because of his race, Black, and in retaliation for his opposition to unlawful employment practices in violation of Sections 703(a)(1) and 704(a) of Title VII, 42 U.S.C. §§ 2000e-2(a)(1) & 2000e-3(a).

      16.      Mr. Powell, a Black person, began his employment at Defendants' Pocono Quarry located near Chalfont, Pennsylvania on or about March 29, 2016. Powell was hired for the position of Operator (Loader).

      17.      Beginning in 2016 and continuing through the end of 2019, Powell's co-workers at the Pocono Quarry subjected him to a continuing course of racial harassment, including but not limited to the following:

      a.      Co-worker Francis J. ("Frank") Bednarek, a White person, frequently used the word "nigger" in reference to Black persons. Powell was present when these statements were made and heard them.

      b.      Powell overheard Bednarek use the phrase "Fuck that nigger" on at least one occasion in apparent reference to Powell. Powell was the only Black employee at the Pocono quarry.

      c.      Bednarek frequently broadcast a podcast or YouTube show over the Pocono quarry's CB radio channel while he and Powell were operating loaders. The hosts of the podcast/show frequently used the epithet "nigger" and made racially stereotyped statements about Black persons and other ethnic minority individuals, including but not limited to references to Black persons eating "chicken and watermelon" and Hispanic persons eating "rice and beans." Eventually, Powell was forced to turn his CB radio off to avoid hearing the broadcasts.

      d.      Bednarek commented to Powell that it would be amusing if Powell went to a Halloween party dressed in a Ku Klux Klan Grand Wizard costume and then revealed to everyone that he is Black. Bednarek stated that the partygoers would then hang Powell.

      e.      Bednarek referred to Hispanic truck drivers who came to Pocono Quarry as "stupid wetbacks." Powell's daughter is Hispanic, a fact that he communicated to Bednarek in response to the comments.

      f.      On or about September 2019, Bednarek observed Powell eating a banana while Powell was in his vehicle and made comments over the CB radio that compared Powell to, or implied that Powell was, a monkey. Powell heard Bednarek's comments over the CB radio.

      g.      During that same time period, Bednarek commented over the CB radio that if a Black job applicant were hired, that applicant and Powell would be able to communicate with one another using "clicking sounds." Powell heard Bednarek's comments, and on various occasions thereafter Bednarek and other White co-workers reminded Powell of those comments and laughed about them.

6

      h.      Bednarek displayed a handgun in the workplace in Powell's presence. On at least one occasion Bednarek took the handgun out of his waistband while in the quarry breakroom and banged it down on a table. He then replaced the handgun in his waistband before leaving the break room, turned around and smiled at employees who were present, including Powell.

      i.      Bednarek made physically threatening statements in conjunction with his display of firearms, such as telling co-workers he preferred a revolver "so that no shell casings would be left behind." Powell heard these statements.

      j.      Other White co-workers also subjected Powell to racial harassment, including but not limited to addressing him as "you fucking nigger" on one occasion; frequently using the epithet "nigger" in his presence in reference to Black persons generally; and making a joke about Powell and the slavery of African-Americans, suggesting that a White co-worker was Powell's "master."

18.    Beginning sometime in 2018 continuing through October 2019, Powell complained to his supervisor, Pocono Quarry Site Superintendent Jeff DeLong, on at least four occasions about being forced to listen to Bednarek's CB radio broadcasts of racist content, and Powell specifically described the content to DeLong.

19.    DeLong responded to Powell's complaints about Bednarek's racial harassment by claiming to have never heard any such broadcasts and demanding that Powell "prove" that Bednarek was doing it before DeLong would take action.

20.    In response to Powell's complaints about Bednarek's CB broadcasts, DeLong failed to ask Powell about any other racial harassment he may have experienced, failed to conduct any investigation of the complaints, and failed to take any corrective action.

21. Prior to October 2019, Powell also complained to DeLong about the racially harassing comments by his other White co-workers, including their use of the word "nigger."

22. In response to Powell's complaints about White co-workers using the epithet "nigger," DeLong failed to ask Powell about any other racial harassment he may have experienced, failed to conduct any investigation of the complaints, and failed to take disciplinary action of any kind against the co-workers.

23. On or about mid-September 2019, Powell reported to DeLong that Bednarek made the aforementioned comments comparing Powell to, or implying that Powell was, a monkey and that Powell and a Black job applicant would be able to communicate with "clicking sounds."

24. DeLong smirked as Powell made his complaint, and he subsequently failed to ask Powell about any other racial harassment he may have experienced, failed to conduct any investigation of the complaint, and failed to take corrective action of any kind against Bednarek.

25. On or about late September 2019, Powell complained of Bednarek's racial harassment to Defendants' Area Manager Arnold Connelly. Connelly instructed Powell to file a grievance through the union.

26. In response to Powell's complaint to Connelly, a meeting was held in early October 2019 between Powell and company managers DeLong, Connelly, and Safety Director James Furey, who performs certain human resources functions for Defendants:

    a. Furey conducted the questioning of Powell.

    b. During the meeting, Powell again complained of racial harassment.

    c. Powell specifically mentioned the "monkey" and "clicking sounds" incidents.

    d. Powell also reported that he had been racially harassed by Bednarek on

other occasions, telling Furey that Bednarek "is constantly making racial remarks" and that "[n]ine times out of 10, I ignore what Frank says, but he had finally hit a button and I had had enough."

  e.  Furey responded to his complaint by stating, "Yeah, that sounds about like Frank."

  f.  Prior to the meeting with Powell, Furey had personally observed Bednarek making similar offensive statements.

  g.  Neither Furey nor any other Defendant official present at the meeting ever asked any follow up questions of Powell to determine the nature of the other racially harassing incidents that Powell mentioned.

  h.  No one asked Powell to identify any witnesses to the harassment.

  i.  DeLong failed to tell anyone who was present at the meeting about Powell's past racial harassment complaints.

27. In response to Powell's racial harassment complaint and the October 2019 meeting, Bednarek admitted to Furey that he had engaged in the most recent two incidents of racial harassment, i.e., the "monkey" and "clicking sounds" incidents. Defendants did not question Bednarik about any other racially harassing incidents.

28. In response to Powell's racial harassment complaint and the October 2019 meeting, Defendants failed to conduct a reasonably diligent investigation of racial harassment at the Pocono Quarry, including but not limited to failing to inquire into any harassment other than the "monkey" and "clicking sounds" incidents, failing to conduct reasonable inquiries of Powell, and failing to interview numerous witnesses to racial harassment at the quarry.

29. In response to Powell's racial harassment complaint and the October 2019 meeting,

Defendants failed to take any disciplinary action against Bednarik or any other employee.

30. On or about June and July 2020, Powell's co-worker Frank Bednarek and other co-workers subjected Powell to additional racial and retaliatory harassment, including but not limited to the following:

    a. A presently unidentified, newly-hired White employee was discussing a news story about a homeless man whose mattress was burned and commented, "Only a dumb nigger would burn his own mattress." Powell heard the statement.

    b. Bednarek made highly threatening comments about the Black Lives Matter movement while at work, such as discussing firearms he and his wife owned and making statements to the effect that there would be a "race war," that he was "ready" for the race war, that George Floyd was a "nigger" who "deserved it," and that if Black Lives Matter protestors wanted to "riot" he [Bednarek] was "ready for it." Bednarek made the aforementioned statements in Powell's presence, and Powell heard those statements.

    c. Bednarek used his company loader to block the road in front of Powell's loader, which prevented Powell from performing his duties.

    d. Bednarek used his company loader to drop a large boulder near Powell's loader, an act that could have caused injury or death and that greatly startled Powell.

    e. In late July 2020, as Powell drove his company loader past Bednarek, who was on foot, Bednarek took a rifle out of his privately-owned vehicle. Both men were on company property at the time. Shortly after Powell parked and exited his loader, Bednarek discharged his rifle, firing four to five rounds in rapid succession from a location only several hundred feet from Powell. Powell found that act to be highly threatening, and he left the Pocono Quarry.

31. Powell then contacted Defendants' management to complain about Bednarek's discharge of a firearm near Powell while on company property:

   a. Powell spoke with Furey, asking whether employees could possess firearms at work.

   b. In response, Furey laughed and queried, "Why do you ask?"

   c. Powell then described the incident involving Bednarek's rifle shots on company property during work hours, to which Furey reacted, "Really?"

   d. Furey then stated that employees were allowed to keep firearms in their cars but that he would look into the shooting incident.

32. At no time did Furey ever follow up with Powell about his complaint concerning the Bednarek shooting incident described above.

33. Defendants failed to take reasonable corrective action in response to the Bednarek shooting incident:

   a. Defendants failed to investigate Bednarek's motive for discharging his firearm in Powell's proximity.

   b. Bednarek was not discharged in response to the shooting incident and his employment at the Pocono Quarry continued after that incident.

   c. Defendants also failed to suspend Bednarek or impose any other, substantial disciplinary action for the shooting incident.

34. Defendants eventually discharged Bednarek from his employment at the Pocono Quarry on or about November 2020. However, the reason for Bednarek's discharge was not racial harassment and any conduct concerning Powell. Rather, Bednarek was fired for making sexual comments about a co-worker's spouse, an individual who was not employed by either of the

Defendants.

35. At all relevant times, including but not limited to the period June 2016 to July 2020, Defendants failed to adopt, implement or disseminate to employees an employment policy defining and prohibiting racial harassment in the workplace.

36. At all relevant times, including but not limited to the period June 2016 to July 2020, Defendants failed to adopt, implement, or disseminate to employees a reasonably diligent complaint procedure concerning complaints of racial harassment in the workplace and investigations thereof.

37. At all relevant times, including but not limited to the period June 2016 to July 2020, Defendants failed to train management personnel concerning racial harassment or investigations, correction or prevention of workplace harassment.

38. The harassment described in Paragraphs 15 through 37, above, was sufficiently severe or pervasive that a reasonable person in such circumstances would have considered Defendants' work environment to be hostile or abusive because of race, Black, and/or retaliation for opposition to unlawful employment practices.

39. The harassment described in Paragraphs 15 through 37, above, caused Powell to consider Defendants' work environment to be hostile or abusive because of race, Black, and/or retaliation for opposition to unlawful employment practices.

40. Defendants knew and reasonably should have known of the harassment described in Paragraphs 15 through 37, above.

41. Defendants failed to take actions reasonably calculated to end the harassment described in Paragraphs 15 through 37, above, and to prevent its reoccurrence.

42. Defendants failed to create reasonable avenues for complaints about racial and

retaliatory harassment and otherwise failed to exercise reasonable care to prevent racial and retaliatory harassment.

43. The effect of the practices complained of in Paragraphs 15 through 42 above has been to deprive Harold Powell of equal employment opportunities and otherwise adversely affect his status as an employee because of race and retaliation for conduct protected by Section 704(a) of Title VII.

44. The unlawful employment practices complained of in Paragraphs 15 through 42 above were intentional.

45. The unlawful employment practices complained of in Paragraphs 15 through 42 above were done with malice or with reckless indifference to the federally protected rights of Harold Powell.

*Count II: Constructive Discharge Because of Race (Black) and Retaliation (Opposition)*

46. The Commission incorporates by reference the factual allegations set forth in Paragraphs 15 through 45, above.

47. On or about July 29, 2020, Defendants subjected Powell to constructive discharge because of his race, Black, and in retaliation for his opposition to unlawful employment practices in violation of Sections 703(a)(1) and 704(a) of Title VII, 42 U.S.C. §§ 2000e-2(a)(1) & 2000e-3(a).

48. As a result of the racial harassment and Defendants' failure to correct and prevent such harassment set forth at Paragraphs 15 through 45, above, Defendants created working conditions sufficiently intolerable that a reasonable person would feel compelled to end their employment.

49. On or about July 29, 2020, Powell resigned his employment at the Pocono Quarry.

50. Powell felt compelled to resign his employment because of the working conditions described above, and he resigned for that reason.

51. The effect of the practices complained of in Paragraphs 46 through 50 above has been to deprive Harold Powell of equal employment opportunities and otherwise adversely affect his status as an employee because of race and retaliation for conduct protected by Section 704(a) of Title VII.

52. The unlawful employment practices complained of in Paragraphs 46 through 50 above were intentional.

53. The unlawful employment practices complained of in Paragraphs 46 through 50 above were done with malice or with reckless indifference to the federally protected rights of Harold Powell.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in unlawful employment practices by creating, tolerating or failing to take action required by law to prevent or correct harassment of employees because of race or because such persons engaged in conduct protected by Section 704(a) of Title VII, including but not limited to opposing employment practices reasonably believed to be unlawful under Title VII.

B. Order Defendants to institute and carry out policies, practices, and programs that provide equal employment opportunities for Black persons and persons who have engaged in conduct protected by Section 704(a) of Title VII, and which eradicate the effects of its past and present unlawful employment practices, including but not limited to an injunction mandating

procedures and employee training regarding Title VII requirements, with particular emphasis on the prohibition of harassment because of race, an employer's legal duty to take actions reasonably calculated to prevent and correct such harassment, and the rights of employees who engage in conduct protected by Section 704(a) of Title VII.

  C. Order Defendants to make whole Harold Powell by providing appropriate backpay with prejudgment interest, in amounts to be determined by the Court, and other affirmative relief necessary to eradicate the effects of their unlawful employment practices, including but not limited to front pay in lieu of reinstatement.

  D. Order Defendants to make whole Harold Powell by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in Paragraphs 15 through 53 above, in amounts to be determined at trial.

  E. Order Defendants to make whole Harold Powell by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in Paragraphs 15 through 53 above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

  F. Order Defendants to pay punitive damages to Harold Powell for malicious and reckless conduct, as described in Paragraphs 15 through 53 above, in amounts to be determined at trial.

  G. Grant such further relief as the Court deems necessary and proper in the public interest.

  H. Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its Complaint.

Respectfully submitted,

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

GWENDOLYN YOUNG REAMS
ACTING GENERAL COUNSEL
WASHINGTON, D.C.

LISA MORELLI
ACTING ASSOCIATE GENERAL COUNSEL
WASHINGTON, D.C.

*Debra M. Lawrence* BY R.L.P. PER AUTHORIZATION

DEBRA M. LAWRENCE
REGIONAL ATTORNEY
MD I.D. # 04312
EEOC – Philadelphia District Office
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21201
(410) 801-6691
(443) 992-7880 (facsimile)
debra.lawrence@eeoc.gov

RONALD L. PHILLIPS
SUPERVISORY TRIAL ATTORNEY
Ohio I.D. # 0070263
EEOC – Baltimore Field Office
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21201
(410) 801-6714
(443) 992-7880 (facsimile)
ronald.phillips@eeoc.gov

16